United States District Court
Southern District of Texas
**ENTERED**
March 30, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STANFORD DEGRAFFENREAID, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-04230 |
| | § | |
| CEVA LOGISTICS U.S., INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court is a Motion for Summary Judgment filed by Defendants CEVA Logistics, U.S., Inc. and CEVA Ground, U.S., LP (jointly, "CEVA" or "Defendants"). (Doc. No. 16). Plaintiff Stanford Degraffenreaid ("Degraffenreaid" or "Plaintiff") filed a response, (Doc. No. 17), and Defendants replied, (Doc. No. 18). Having reviewed these documents, the record, and the applicable law, the Court hereby GRANTS Defendants' Motion for Summary Judgment. (Doc. No. 16).

## BACKGROUND

This is a disability discrimination case. Degraffenreaid began working at CEVA in 2010 as a Fleet Manager and was promoted to Fleet Operations Manager by 2012. (Doc. No. 16-1 at 46:17, 57:5–9) (Deposition Transcript of Stanford Gegraffenreaid). As the Fleet Operations Manager, Degraffenreaid worked onsite, along with his subordinates, supervising up to 15 employees and helping to handle escalated issues. (*Id.* at 92:24–93:10); (Doc. No. 17-2 at 2) (Stanford Degraffenreaid's Declaration).

In November 2013, Degraffenreaid was diagnosed with chronic kidney disease. (Doc. No. 17-2 at 2); (Doc. No. 16-1 at 264:22–24). As a result, he sought regular care from his physician and nephrologist. (Doc. No. 16-1 at 265:24–266:6). Between 2013 and 2020, Degraffenreaid's doctors monitored his condition through bloodwork completed every four to six months. (*Id.* at 270:5–15). Degraffenreaid was not on any medication for his condition and did not receive any dialysis treatments during this time. *See (id.)*.

In March 2020, the COVID-19 pandemic hit the United States. Since CEVA was an essential business, it remained operational during the pandemic and Degraffenreaid was still required to be in the office. (*Id.* at 95:4–96:21). While CEVA implemented safety procedures to minimize employees' exposure to COVID-19, Degraffenreaid testified that he felt these procedures were not being followed or taken seriously. (*Id.* at 199:1–202:24). Nevertheless, Degraffenreaid continued to work at CEVA for the first five months of the pandemic. He testified that he never tested positive for COVID-19, nor did any of the employees he supervised. (*Id.* at 122:1–11; 202:25–203:9).

On July 28, 2020, Degraffenreaid received blood test results indicating that his Glomerular Filtration Rate ("GFR") had "plummeted" to below 10. (*Id.* at 157:7–14); (Doc. No. 17-2 at ¶ 6).[1] Degraffenreaid testified that, at this stage, "dialysis would have been recommended" but he did not have insurance to cover it. (Doc. No. 16-1 at 246:20–25). That same day, Degraffenreaid told his supervisor, Jonathan Lovelace, that he had a "health issue" that put him at risk of COVID-19 and he needed to "do something safe and stay home until [he] figure[d] out [what was] going on."

---

[1] Plaintiff avers in his declaration that, prior to July 28, 2020, his GFR was consistently between 15-19, meaning he had Stage 4 chronic kidney disease. (Doc. No. 17-2 at ¶ 6). When his GFR dropped below 15 in July 2020, he was considered to have Stage 5 chronic kidney disease or End Stage Renal Disease ("ESRD"). (*Id.* at ¶ 5–6). For the sake of this order, the Court refers to Plaintiff's condition as "chronic kidney disease" since that description applies during the entirety of the relevant timeline.

(*Id.* at 160:1–10, 160:22–161:5). Degraffenreaid told Lovelace he was going to need to "take some PTO." (*Id.* at 160:9–10). Degraffenreaid did not report to work the next day, July 29, 2020. (*Id.* at 250:4–7). A few days later, Degraffenreaid checked in with Lovelace again, informing him that he was trying to find a new physician and specialist. (*Id.* at 162:21–164:15).

Degraffenreaid then accessed The Hartford portal, the third-party Family and Medical Leave Act ("FMLA") and disability administrator used by CEVA. (*Id.* at 176:23–177:1; 178:3–179:3). Degraffenreaid applied for FMLA and short-term disability benefits through The Hartford. (*Id.* at 179:25–180:8). Around August 3, 2020, Degraffenreaid received a letter from The Hartford stating that he was eligible for FMLA leave and a determination on his short term benefits was pending. (*Id.* at 187:19–189:1); (Doc. No. 16-3 at 1) (August 3, 2020 Letter). The letter specifically provided that once The Hartford received "the necessary information" from Degraffenreaid's health care provider to support his leave request, due by August 20, 2020, they would make a determination regarding his request for short term benefits. (Doc. No. 16-1 at 189:1–7).

On August 4, 2020, Degraffenreaid emailed Lovelace an update, stating that he was "awaiting an appointment with a [s]pecialist to determine [his] next course of action" and he "would like to continue to take PTO to ensure [he] stay[s] safe" and "protect [his] physical health from COVID-19 risks." (*Id.* at 197:14–198:15); (Doc. No. 16-4 at 3). Degraffenreaid then received another letter from The Hartford stating that his short term benefit claim had been denied and that, if he wished to pursue leave under the FMLA, his health care provider needed to complete the Certificate of Health Care Provider form by August 25, 2020. (Doc. No. 16-3 at 2).

At the same time, Degraffenreaid was still trying to make an appointment with a specialist. He emailed Lovelace on August 11, 2020, stating that he had confirmed an appointment with a specialist for August 31, 2020, but was working to try to find an earlier appointment. *See* (Doc.

3

No. 16-4 at 1). Degraffenreaid ultimately confirmed with Lovelace on August 12, 2020, that he was unable to secure an earlier appointment. (*Id.*).

Around August 14, 2020, Degraffenreaid received another letter from The Hartford stating that they had not received the supporting documentation they previously requested and again requested that Degraffenreaid have his health care provider complete a Certificate of Health Care Provider form to support his FMLA request. (*Id.* at 192:8–20) (Doc. No. 16-3 at 3) (August 14, 2020 Letter). Degraffenreaid admitted that it was his understanding that The Hartford required information from his health care provider, but he did not recall the details of whether he or his doctor had submitted the requested information. (Doc. No. 16-1 at 189:8–191:5). On August 19, 2020, The Hartford sent Degraffenreaid a letter denying his requests for FMLA leave and short term benefits. (Doc. No. 16-3 at 5).

In light of Degraffenreaid's requests being denied, CEVA sent a letter to Degraffenreaid on August 21, 2020, informing him that his continued absences would be considered unexcused if he did not provide a physician's note supporting his time away by August 25, 2020. (Doc. No. 16-5) (August 21, 2020 CEVA Letter). The letter noted that without a doctor's note, CEVA expected Degraffenreaid to return to work immediately. (*Id.*). On August 25, 2020, Degraffenreaid sent an email to Lovelace and Kendace Culbreth, an employee in human resources at CEVA, attaching a letter from Dr. Bazgha Khalid, a doctor at Kesley-Seybold Clinic, stating that Degraffenreaid was a patient in his medical practice and "[b]ased on guidelines regarding COVID-19 disease, he [was] at a higher than average risk for complications than the general population." (Doc. No. 16-7 at 3). Degraffenreaid testified that Dr. Khalid did not tell him he was unable to work and no doctor told him he could not work, or should not go into work. (Doc. No. 16-1 at 210:12–15, 251:21–25, 273:25–274:4, 276:16–20,278:7–9,279:25–280:2).

4

On August 26, 2020, Culbreth emailed Lovelace asking if Degraffenreaid had provided any additional medical documentation. *See* (Doc. No. 17-11 at 2). Lovelace reported that he had not received anything. (*Id.*). On August 28, 2020, CEVA terminated Degraffenreaid's employment reportedly because he had "not reported to work and failed to provide the requested information necessary to support [his] continued absence." (Doc. No. 16-8).

Degraffenreaid filed his Original Complaint on November 8, 2023. *See* (Doc. No. 1). He asserts claims against CEVA for (1) "disability/perceived disability discrimination and failure to reasonably accommodate" under the Americans with Disabilities Act ("ADA") and the Texas Commission on Human Rights Act ("TCHRA"); and (2) retaliation under the ADA and TCHRA/Texas Labor Code. (Doc. No. 1 at 5–6). Subsequently, Defendants filed their Motion for Summary Judgment on all of Plaintiff's claims. (Doc. No. 16).

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all

reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

Defendants move for summary judgment on all of Plaintiff's claims. Specifically, Defendants contend that Plaintiff's disability discrimination claims fail because Plaintiff's kidney disease did not constitute a disability, nor did he request reasonable accommodation. *See* (Doc. No. 16 at 6). Further, Defendants maintain that they terminated Plaintiff for a legitimate, non-discriminatory reason and Plaintiff offers no evidence of pretext. (*Id.*). For these same reasons, Defendants argue summary judgment should be granted on Plaintiff's retaliation claim. (*Id.*).

### I.   Plaintiff's Disability Discrimination Claim

Defendants contend that Plaintiff's disability discrimination claim fails because (1) Plaintiff cannot establish his *prima facie* case because "he was not disabled during his employment, nor was he regarded as disabled;" and (2) even if Plaintiff meets his *prima facie* burden, his claim fails because "CEVA terminated him for a legitimate, nondiscriminatory reason." (Doc. No. 16 at 12–16).

### A.   *Plaintiff's* Prima Facie *Case*

First, since the language of the TCHRA mirrors the language of the ADA, "Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams v. Tarrant Cnty. Coll.*

*Dist.*, 717 F. App'x 440, 445 (5th Cir. 2018) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285–87 (5th Cir. 2004), abrogated on other grounds by *Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023)).[2] "To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability, (2) that he was qualified for the job, and (3) that he was subject to an adverse employment decision on account of his disability." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

Under the ADA, "disability" means: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.A. § 12102(2); TEX. LAB. CODE ANN. § 21.002(6). "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C.A. § 12102(2); *see* Tex. Labor Code Ann. § 21.002(11-a) (providing the same definition). Additionally, a major life activity includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C.A. § 12102(2)(B).

---

[2] The Court also analyzes Plaintiff's other claims brought under the TCHRA and the ADA (failure to accommodate and retaliation) under the legal standards of the ADA. *See, e.g.*, *Gober v. Frankel Fam. Tr.*, 537 F. App'x 518, 520 (5th Cir. 2013) ("[W]e consider these [ADA and TCHRA] claims together and apply the legal standards for the ADA to analyze both claims."); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348 (5th Cir. 2019) (conducting a single analysis under the ADA to evaluate the plaintiff's TCHRA and ADA retaliation claims); *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006) ("Given the similarity between the ADA and the TCHRA, Texas courts 'look to analogous federal precedent for guidance when interpreting the Texas Act.'" (quoting *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex.1999)).

Defendants contend that Plaintiff cannot meet his burden to show his chronic kidney disease substantially limited a major life activity in August 2020. *See* (Doc. No. 16 at 13). Defendants assert that Plaintiff worked at CEVA "without need for accommodations or under work restrictions," and, at the time that Plaintiff stopped going into work, Plaintiff was "physically able to work" and no doctor had advised him otherwise. (*Id.*).

Plaintiff, however, argues that he was continuously ill throughout his employment at CEVA, even being "admitted into the ICU for a few days due to his illness," *see* (Doc. No. 16-1 at 121:1–14), and that he started dialysis in April 2023, "confirming the seriousness of his condition" in August 2020, (*Id.* at 35:7–36:8). (Doc. No. 17 at 12). Plaintiff maintains that his chronic kidney disease did limit major life activities, pointing to his testimony that he had trouble sleeping (experiencing periods of insomnia), and had to undergo a diet change to lose weight. (Doc. No. 17 at 12); (Doc. No. 16-1 at 238:22–239:8, 246:20–247:7). At the time Plaintiff stopped going into work, Plaintiff reports that his GFR was below 10, meaning that "his kidneys [had] lost almost all ability to function effectively" and this was an indicator that "he may need dialysis or a kidney transplant to live." (*Id.*); (Doc. No. 17-2 at ¶ 6) (Stanford Degraffenreaid's Declaration). Further, in his declaration, Plaintiff testified that he "sought regular care from [his] physician and nephrologist and would periodically take time off work to receive medical treatment or attend doctor's visits." (Doc. No. 17-2 at ¶ 5). Additionally, he testified that he would "experience fatigue, weakness, and difficulties with eating and digestion as a result of [his alleged] disability." (*Id.*).

The Court finds that there is a fact issue as to whether Plaintiff had a disability under the ADA. Plaintiff has provided evidence that his chronic kidney disease impacted his eating, sleeping, and working – he testified that he had to change his diet to lose weight, he experienced difficulties

8

with eating and digestion, he struggled to sleep at times, and he had to periodically take time off work to address his condition. *See* (Doc. No. 16-1 at 238:22–239:8, 246:20–247:7); (Doc. No. 17-2 at ¶ 5). Thus, Plaintiff has a raised a fact issue as to whether his chronic kidney disease "substantially limit[ed] one or more of [his] major life activities," and consequently, as to whether he has a disability under the ADA/TCHRA. 42 U.S.C.A. § 12102(2); TEX. LAB. CODE ANN. § 21.002(6).[3]

### B. Plaintiff's Termination

Plaintiff attempts to prove his disability discrimination claim by indirect (circumstantial) evidence. When a claim involves circumstantial evidence, courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a discrimination claim. First, the plaintiff must establish a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05.

Since the Court found that Plaintiff raised a fact issue as to his *prima facie* burden, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. Defendants maintain that they terminated Plaintiff because he "missed eighteen days of work" and "never provided medical documentation to support his absence." (Doc. No. 16 at 14). Plaintiff, Defendants argue, "elected not to work despite the absence of any directive from a

---

[3] Defendants also discuss Plaintiff's claim that he was "regarded as" having a disability under the ADA/TCHRA. *See* (Doc. No. 16 at 13–14). The Court need not address this for the purposes of this order since Plaintiff has established a fact issue as to whether his chronic kidney disease constitutes a disability.

physician." (*Id.*). Defendants point to Plaintiff's deposition as evidence that he, too, understands their legitimate, non-discriminatory reason for his termination: "I did not provide information in a timely manner, and . . . I was unexcused and abandoned my job." (Doc. No. 16-1 at 245:23–246:2). Defendants assert that Fifth Circuit caselaw, and other federal court caselaw, support summary judgment under these circumstances. *See* (Doc. No. 16 at 15).

Plaintiff concedes in his deposition that, as of July 29, 2020, he stopped going to work. *See* (Doc. No. 16-1 at 250:4–14). He testified that he did not receive any advice from his doctor, Dr. Khalid, to not go to work. *See* (*id.* at 251:11–25). Further, no doctor told him he could not work or should not go into work. (Doc. No. 16-1 at 210:12–15, 251:21–25, 273:25–274:4, 276:16–20, 278:7–9, 279:25–280:2). Plaintiff testified that he received and read the letter from Defendants on August 21, 2020, informing him that his continued absences would be considered unexcused if he did not provide a physician's note supporting his time away by August 25, 2020. (Doc. No. 16-1 at 205:2–206:9);(Doc. No. 16-5). In response, on August 25, 2020, Plaintiff sent a letter from Dr. Khalid stating that Plaintiff was "at a higher than average risk for complications [from COVID-19] than the general population." (Doc. No. 16-7 at 3). Plaintiff provided no additional documentation supporting his absence.

Finding that Defendants have offered a legitimate, nondiscriminatory explanation for terminating Plaintiff, the burden shifts to Plaintiff to show that Defendants' reasons were pretext for discrimination. "In conducting a pretext analysis, the court does not 'engage in second-guessing of an employer's business decisions.'" *Roberson-King v. Louisiana Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)). A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d

572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "At the end of the day, the pretext inquiry asks whether there is sufficient evidence 'demonstrating the falsity of the employer's explanation, taken together with the prima facie case,' to allow the jury to find that discrimination was the but-for cause of the termination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015).

Plaintiff argues that the "crux of this case" is that when Plaintiff needed a few additional days past the August 25, 2020 deadline to provide additional documentation to support his absence, Defendants "terminated him instead of continuing the interactive process as required under the law." (Doc. No. 17 at 25–26). Plaintiff points to the letter from Dr. Khalid that he provided to Defendants as evidence that he had submitted documents "supporting his need for leave." (*Id.* at 26). Further, Plaintiff maintains that he was actively attempting to get an earlier appointment with a specialist to provide additional documentation to Defendants, and he continually updated Lovelace regarding the status of his appointment. (*Id.*); *see* (Doc. No. 17-6) (Plaintiff's emails to Lovelace). Yet, just one day after Plaintiff told Lovelace he was unable to obtain an appointment earlier than August 31, 2020, "CEVA gave [Plaintiff] a deadline to provide medical documentation before his known appointment with the specialist would occur." (Doc. No. 17 at 26). As such, Plaintiff argues, Defendants "refused to work with Plaintiff to provide some additional time . . . to see the specialist . . . or temporarily provide him with a reasonable accommodation." (*Id.*).

The Court finds that Plaintiff's evidence is not sufficient to establish a genuine issue of material fact regarding Defendants' legitimate, non-discriminatory reason for terminating Plaintiff. Indeed, Plaintiff's evidence of pretext essentially mirrors Defendants' own explanation for terminating Plaintiff. Plaintiff concedes that he did not supply Defendants with the requested medical documentation supporting the eighteen days of work he missed. Instead, he appears to

11

argue that the deadline imposed by Defendants for producing the medical documentation constituted Defendants' wrongful denial of his requested accommodation for additional days to complete his appointment with a new nephrologist. This evidence does not indicate that Defendants' "proffered explanation is false or 'unworthy of credence.'" *Laxton*, 333 F.3d at 578.

In fact, Plaintiff's evidence supports Defendants' legitimate, non-discriminatory reason for terminating Plaintiff – Plaintiff did not show up for work for eighteen days and, when asked to either provide medical documentation to support such absence or return to work, Plaintiff failed to do either. Summary judgment is appropriate under these circumstances. *See, e.g., Trautman v. Time Warner Cable Tex., L.L.C.*, 756 F. App'x 421, 428–30 (5th Cir. 2018) (affirming summary judgment for the employer where, among other reasons, it had a legitimate, non-discriminatory reason for firing the employee because she accrued over 200 hours of unexcused absences); *Bell v. Dallas Cty.*, 432 F. App'x 330, 334 (5th Cir. 2011) (per curiam) (affirming summary judgment, in part, because the employer terminated the employee not for using his FMLA leave, but because "his non-FMLA absences were excessive."); *Powers v. Woodlands Religious Cmty. Inc.*, 323 F. App'x 300, 302 (5th Cir. 2009) ("[employer's] stated reason for [employee's] termination—absenteeism—is a legitimate nondiscriminatory reason for its decision.").

In conclusion, the Court finds that Plaintiff has not adequately raised a dispute of fact through summary judgment evidence that Defendants' reason for terminating him for his unexcused absences was pretext for discrimination. Accordingly, the Court grants summary judgment to Defendants on Plaintiff's disability discrimination claim.

## II.    Plaintiff's Retaliation Claim

Defendants contend that Plaintiff's retaliation claim should be dismissed for the same reasons discussed above. *See* (Doc. No. 16 at 19). Specifically, Defendants maintain that they had

12

a legitimate, non-discriminatory reason for terminating Plaintiff and he does not challenge Defendants' reason as being pretext for discrimination or retaliation. *See* (*id.*).

To establish a *prima facie* case of retaliation, a plaintiff must establish: "(1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). Once a plaintiff has met its *prima facie* burden, the burden shifts to the defendant to offer a "legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant offers such a reason, the plaintiff must "adduce sufficient evidence that the proffered reason is a pretext for retaliation." *Id.* "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*

Defendants do not argue that Plaintiff has not met his *prima facie* burden; instead, Defendants maintain that they had a legitimate, non-discriminatory reason for terminating Plaintiff—he "missed eighteen days of work" and "never provided medical documentation to support his absence." (Doc. No. 16 at 14). In his response, Plaintiff first argues that he has established a *prima facie* case of retaliation. *See* (Doc. No. 17 at 22–23). Specifically, Plaintiff asserts that he engaged in protected activity when he made reasonable requests for accommodation under the ADA; he suffered from an adverse action when his employment was terminated; and the close temporal proximity between the two, as well as other summary judgment evidence, shows that Defendants' decision to terminate Plaintiff was directly related to his alleged requests for accommodation. (*Id.* at 23–25). Further, Plaintiff maintains the exact same arguments laid out above regarding how Defendants' alleged legitimate, non-discriminatory reason for terminating Plaintiff was pretext for retaliation. *See* (*id.* at 25–27); *see also supra* Part I.B..

13

Since both parties assert identical arguments here as discussed above regarding Plaintiff's termination, *see* discussion *supra* Part I.B., the Court similarly finds that Plaintiff has failed to establish a dispute of material fact that Defendants' reason for terminating Plaintiff for his unexcused absences was pretext for retaliation. Plaintiff has not provided evidence that Defendants terminated Plaintiff in retaliation for his requests for FMLA leave and short term benefits. Accordingly, the Court grants Defendant's Motion for Summary Judgment regarding Plaintiff's retaliation claim.

### III.   Plaintiff's Failure to Accommodate Claim

Defendants argue that Plaintiff's failure to accommodate claim should be dismissed for several reasons: (1) Plaintiff's application for FMLA leave is not a request for accommodation; (2) even if Plaintiff's request for FMLA leave constituted a request for accommodation, Plaintiff failed to engage in the interactive process; and (3) considering Plaintiff's argument in his Response that his need for additional days to produce the medical documentation to Defendants was a request for accommodation, the facts do not support that Defendants wrongfully denied this alleged request. (Doc. No. 16 at 16–19); (Doc. No. 18 at 2–3).

Under the ADA, "a plaintiff in this circuit 'must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Trautman*, 756 F. App'x at 430 (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013)). The ADA defines "reasonable accommodations" to include "job restructuring," "part-time or modified work schedules," "acquisition or modification of equipment or devices," "training materials or policies," and "other similar accommodations" for individuals

14

with disabilities. 42 U.S.C. § 12111(9)(B). "Providing a 'reasonable accommodation' does not require the employer to 'relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees or hire new employees to perform those duties.'" *Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 254–55 (5th Cir. 2017) (quoting *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998)). The Fifth Circuit has held that "[i]ndefinite leave is not a reasonable accommodation." *Amsel v. Tex. Water Dev. Bd.*, 464 Fed. App'x at 395, 400 (5th Cir. 2012) (per curiam).

"Employees who require accommodation due to a disability are responsible for requesting a reasonable accommodation." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017). "When an employee 'requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation.'" *Trautman*, 756 F. App'x at 430 (quoting *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009)). The question is whether "an employer's unwillingness to engage in a good faith interactive process *leads to* a failure to reasonably accommodate an employee." *Claiborne*, 690 F. App'x at 253. Only in that situation does an employer violate the ADA. *Id.* An employer "cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *Loulseged v. Akzo Nobel Inc.,* 178 F.3d 731, 736 (5th Cir.1999)).

Plaintiff argues that there are three potential incidents in which he requested an accommodation: (1) when he requested FMLA leave; (2) when he requested short term benefits; and (3) when he allegedly requested an additional six days of leave to attend his August 31, 2020 appointment with his specialist. (Doc. No. 17 at 19–20). The Court will address each in turn.

### A. *Plaintiff's Request for FMLA Leave*

First, the Fifth Circuit has held that "a request for FMLA leave is not a request for a reasonable accommodation under the ADA." *Acker*, 853 F.3d at 791. "[A]n employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job." *Id.* at 791–92. As such, as a matter of law, Plaintiff's first alleged request is not a valid request for accommodation under the ADA.

### B. *Plaintiff's Request for Short-Term Disability Benefits*

Second, Plaintiff contends that his request for short term benefits was a request for accommodation under the ADA. The Court, however, cannot determine whether Plaintiff's request for short term benefits was a request for accommodation because Plaintiff has not provided information on the requirements to obtain short term benefits, or leave, under the Defendants' policies. Plaintiff testified in his deposition that he does not recall what the requirements were for short term benefits. *See* (Doc. No. 16-1 at 180:9–14). If the requirements for short term benefits were anything like those for FMLA leave, Plaintiff's request for short term benefits may not constitute a request for accommodation.

Even assuming that Plaintiff's request for short term benefits was a valid request for accommodation, Plaintiff provides no evidence that Defendants were unwilling to engage in a good-faith, interactive process with Plaintiff. The evidence provided shows that Plaintiff received blood test results on July 29, 2020, indicating that his health was declining; he informed his supervisor, Lovelace, that he needed to stay home until he figured out next steps; and Lovelace allowed him to do so. *See* (Doc. No. 16-1 at 160:1–10, 160:22–162:5). Plaintiff then applied for FMLA leave and short term benefits, continually updating Lovelace on the status of his doctor

16

appointments. *See* (Doc. No. 16-4). Lovelace repeatedly acknowledged the updates, requesting that Plaintiff continue to keep him informed. (*Id.*). On August 4, 2020, Plaintiff received a letter from The Hartford informing him that his request for short term benefits had been denied. (Doc. No. 16-3 at 5).[4]

Plaintiff, however, continued to remain home while still pursuing his request for FMLA leave. Defendants did not request any additional medical documentation to support Plaintiff's further absence from work until *after* Plaintiff had been denied both FMLA leave and short term benefits. *See* (Doc. No. 16-5). Even when Defendants requested documentation to support Plaintiff's absence, they provided Plaintiff with four additional days to produce such documentation. (*Id.*). Defendants ultimately allowed Plaintiff to be absent from work to pursue FMLA leave and short term benefits from July 29, 2020, to August 25, 2020.

None of the information provided above by both Plaintiff and Defendants indicates that Defendants' "unwillingness to engage in a good faith interactive process" led to the denial of Plaintiff's request for short term benefits. *Claiborne*, 690 F. App'x at 253. Thus, even assuming Plaintiff's request for short term benefits was a valid request for accommodation, Plaintiff has not shown that Defendants violated the ADA in denying that request. Plaintiff has not provided evidence of a genuine issue of material fact regarding Defendants' alleged failure to accommodate his request for short term benefits. Accordingly, the Court grants Defendants' Motion for Summary Judgment regarding this request.

---

[4] None of the parties provided evidence establishes why Plaintiff was denied short term benefits. The Hartford's August 3, 2020 letter states that once they "obtain[ed] the necessary information from [Plaintiff's] health care provider to support [his] leave request," they would make a "determination to approve or deny [his] request for Short Term Disability (STD) benefits." (Doc. No. 16-3 at 1). By August 4, 2020, The Hartford had sent Plaintiff a letter informing him his short term benefits claim had been denied. (Doc. No. 16-3 at 2). Plaintiff also testified that he did not know why The Hartford denied his request for short term benefits. (Doc. No. 16-1 at 191:19–23).

## C. Plaintiff's Request for Additional Time

Third, Plaintiff contends that his last request for accommodation was when he "requested leave" until August 31, 2020, "so that he could see his specialist and get additional medical documentation to provide" to Defendants. (Doc. No. 17 at 20). Again, Plaintiff had been absent from work from July 29, 2020, to August 21, 2020 at this point. On August 21, 2020, Defendants sent Plaintiff a letter essentially stating that Plaintiff must either return to work immediately or provide a doctor's note supporting his time away from work by August 25, 2020. *See* (Doc. No. 16-5). On August 25, 2020, Plaintiff sent Defendants a letter, attaching a note from Dr. Khalid stating that Plaintiff was at a "higher than average risk" for complications from COVID-19. *See* (Doc. No. 16-7). The letter did not mention Plaintiff's August 31, 2020 appointment with a specialist.

While Plaintiff argues that he "requested leave" until August 31, 2020, there is no evidence that demonstrates that Plaintiff made this request. Plaintiff appears to contend that he "requested leave" by merely informing Lovelace of his August 31st appointment. *See* (Doc. No. 16-4 at 1). Thus, Plaintiff alleges that when Defendants requested Plaintiff provide medical documentation to support his absence by August 25, 2020, Defendants failed to accommodate the request. *See* (Doc. No. 16-5). Plaintiff, however, as the employee requiring accommodation due to a disability, is "responsible for requesting a reasonable accommodation." *Acker*, 853 F.3d 784, 791 (5th Cir. 2017). Merely informing a supervisor of an upcoming doctor's appointment as part of continuous updates is likely not a "request" for accommodation. Indeed, if Plaintiff wanted to request that Defendants provide him until August 31, 2020, to obtain the requested documentation, he could have easily requested this in his letter to Defendants on August 25, 2020. *See* (Doc. No. 16-7).

18

Even assuming Plaintiff's provided facts constitute a "request for accommodation," Plaintiff has not provided evidence that Defendants failed to engage in "flexible, interactive discussions to determine the appropriate accommodation." *Trautman*, 756 F. App'x at 430. When Defendants asked for medical documentation to support any further absence from work, Plaintiff merely provided one doctor's note stating that Plaintiff was at a higher risk for COVID-19 complications. (Doc. No. 16-7 at 3). While Plaintiff alleges that the August 31, 2020, appointment would have resulted in the requested doctor's note supporting his absence, Plaintiff provides no evidence supporting this speculation. In fact, the evidence provided contradicts this assumption – Plaintiff's note from Dr. Khalid did not state that Plaintiff needed leave through August 31, 2020, or that he needed any accommodations, *see* (Doc. No. 16-7), and Plaintiff himself testified that no doctor told him he could not work, or should not go into work. (Doc. No. 16-1 at 210:12–15, 251:21–25, 273:25–274:4, 276:16–20,278:7–9,279:25–280:2).

If anything, Plaintiff himself failed to engage in the interactive process by failing to provide Defendants with documentation showing his requested accommodation was necessary. An employer will not be found to have violated the ADA "when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Griffin*, 661 F.3d at 224. In this case, Plaintiff arguably did not request an accommodation and, even if he did, he failed to produce information supporting his request for Defendants. Plaintiff, thus, did not "engage in flexible, interactive discussions to determine the appropriate accommodation'" and Defendants cannot be liable for his failure to do so. *Trautman*, 756 F. App'x at 430.

Accordingly, Plaintiff has not established a dispute of material fact in relation to his alleged request for accommodation regarding additional leave until his August 31st appointment. The

19

Court grants summary judgment on Plaintiff's failure to accommodate claim regarding his request for additional leave.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in its entirety, and all of Plaintiff's claims are DISMISSED with prejudice. A Final Judgment will be entered separately.

Signed on this the __30__ day of March 2026.

Andrew S. Hanen
United States District Judge